**Andrew Dean**
**Osman Nawaz\***
**Preethi Krishnamurthy**
**Joshua Brodsky**
**David H. Tutor**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004**
**(212) 336-0024 (Tutor)**
**Email: TutorD@sec.gov**
**\*Not admitted in U.S. District Court for the S.D.N.Y.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| **Plaintiff,** | **____Civ. ____** |
| -against- | **ECF CASE** |
| **SCOTT LINDELL,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against

Defendant Scott Lindell ("Lindell"), alleges as follows:

### SUMMARY

1.       Lindell—the former Chief Risk Officer ("CRO"), head of operations, and Chief

Compliance Officer ("CCO") and a former portfolio manager and member of the Valuation

Committee of SEC-registered investment adviser Infinity Q Capital Management LLC ("Infinity

Q")—was negligent with respect to a fraudulent scheme that inflated the value of assets held by a

mutual fund and a hedge fund by more than $1 billion.

2.      From at least February 2017 through February 2021 (the "Relevant Period"),
James Velissaris, the founder and former chief investment officer ("CIO") of Infinity Q, actively
manipulated the valuation models available from a certain third-party pricing service (the
"Pricing Service") and altered inputs to mask the poor performance of the mutual fund and hedge
fund that Infinity Q advised (collectively, the "Infinity Q Funds" or the "Funds"). This scheme
allowed the Infinity Q Funds to attract investor funds and keep investors from redeeming their
investments and allowed Velissaris to enrich himself through performance and management fees.

3.      Unbeknownst to investors, Velissaris knowingly inflated the Infinity Q Funds'
stated valuations in at least four ways during the Relevant Period: Velissaris manipulated
computer code in the Pricing Service's valuation models; entered inputs he knew were incorrect
into the Pricing Service; selected certain valuation models in the Pricing Service that he knew
could not properly value the relevant positions; and knowingly cherry-picked one of the key
valuation inputs.

4.      The pricing manipulations materially inflated the mutual fund's net asset values
("NAVs") and the private fund's total assets, as well as the Funds' reported performance, and
Infinity Q and Velissaris disseminated materially false and misleading information about the
Infinity Q Funds' valuations, performance, and investment terms to investors.

5.      By September 2020, the fraudulent scheme had resulted in the overvaluation of
the Infinity Q Funds by over $1 billion.[1]

---

[1]      On February 17, 2022, the Commission commenced a civil action against Velissaris for
violating the anti-fraud and other provisions of the federal securities laws concerning his
mismarking of the assets held by the Infinity Q Funds. *See SEC v. Velissaris*, 22 Civ. 1346
(S.D.N.Y.). The same day, the United States Attorney's Office for the Southern District of New

6.      Lindell—in his role as Infinity Q's CRO, head of operations, portfolio manager, and CCO, and as a member of the Infinity Q Valuation Committee—failed to exercise reasonable care and failed to undertake an appropriate investigation concerning multiple red flags that indicated Velissaris's valuations of the Infinity Q Funds' positions were inappropriate.

7.      Lindell negligently misrepresented to investors and potential investors, representatives of the board of the mutual fund, and others that the Pricing Service was "independent" from Infinity Q when, in fact, Velissaris exercised control over the Pricing Service.

8.      Lindell, at Velissaris's direction, also helped Velissaris submit misleading documents to the SEC staff in response to the SEC's initial inquiries in this matter and, on one occasion, helped Velissaris mislead the mutual fund's auditor with at least reckless disregard of the truth. Lindell also willfully made misstatements on Infinity Q's Form ADV filings.

9.      Since 2017, Lindell has received annual and incentive bonuses totaling millions of dollars. Since 2019, Lindell has received profit distributions of management and performance fees from Infinity Q, totaling millions of dollars.

## VIOLATIONS

10.      By virtue of the foregoing conduct and as alleged further herein:

a.      Lindell violated Sections 17(a)(2) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2) and (3)], Rule 13b2-2 of the Securities Exchange Act

---

York unsealed an indictment charging Velissaris with securities and other frauds, making false statements to auditors, and obstruction of justice for his falsification of documents in response to the SEC staff's requests, among other things. *See United States v. Velissaris*, 22 Cr. 105 (S.D.N.Y.).

of 1934 ("Exchange Act") [17 C.F.R. § 240.13b2-2], Sections 206(2), 206(4), and 207 of the

Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(2), 80b-6(4), 80b-7], and

Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]; and

      b.     Lindell aided and abetted Infinity Q's violations of Sections 204(a) and 206(4) of

the Advisers Act [15 U.S.C. §§ 80b-4(a), 80b-6(4)] and Rules 204-2(a) and 206(4)-7 thereunder

[17 C.F.R. §§ 275.204-2(a), 275.206(4)-7].

      11.     Unless Defendant is restrained and enjoined, he will engage in the acts, practices,

transactions, and courses of business set forth in this Complaint or in acts, practices, transactions,

and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

      12.     The SEC brings this action pursuant to the authority conferred upon it by Section

20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C.

§ 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

      13.     The SEC seeks a final judgment: (a) permanently enjoining Defendant from

violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering

Defendant to disgorge all ill-gotten gains he received as a result of the violations alleged herein

and to pay prejudgment interest thereon; (c) ordering Defendant to pay civil money penalties

pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the

Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-

9(e)]; (d) permanently prohibiting Defendant from acting as an officer or director of any issuer

that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §

78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §

78o(d)] pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; and

(e) ordering any other and further relief the Court may deem appropriate or necessary.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and

Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

15.     Defendant has, directly and indirectly, made use of the means or instrumentalities

of interstate commerce or of the mails in connection with the transactions, acts, practices, and

courses of business alleged herein.

16.     Venue lies in this District under Section 22(a) of the Securities Act [15 U.S.C.

§ 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers

Act [15 U.S.C. § 80b-14]. Certain of the acts, practices, transactions, and courses of business

alleged herein occurred in this District, where Infinity Q had its offices during the Relevant

Period and where at least one victim of the fraudulent scheme alleged here has its principal place

of business and/or resides.

## DEFENDANT

17.     **Lindell**, age 43, was the CRO, head of operations, CCO, and a portfolio manager

of Infinity Q, as well as a member of its Valuation Committee. Lindell is also a minority owner

of Infinity Q Management Equity, LLC ("Infinity Q Management Equity"), which is the majority

owner of Infinity Q. Lindell was associated with several broker-dealers prior to 2011.

## RELATED INDIVIDUAL AND ENTITIES

18.     Velissaris, age 37, was the founder and CIO of Infinity Q and exercised control over Infinity Q during the Relevant Period until he was removed in approximately February 2021. Velissaris is the majority owner of Infinity Q Management Equity.

19.     Infinity Q is registered with the SEC as an investment adviser and is headquartered in New York, New York. Infinity Q was organized as a Delaware limited liability company in 2014. Infinity Q advises a mutual fund, the Infinity Q Diversified Alpha Fund mutual fund (Ticker: IQDNX) (the "Mutual Fund"), and a hedge fund, the Infinity Q Volatility Alpha Fund, L.P. (Private Fund Identification Number 805-134725947) (collectively with any feeder funds, the "Private Fund"). The Mutual Fund and the Private Fund are pooled investment vehicles within the meaning of Rule 206(4)(b)-8(b) of the Advisers Act, 17 C.F.R. § 275.206(4)-8(b).

20.     Infinity Q's principal owners are Infinity Q Management Equity and a limited partnership (the "Limited Partnership").

21.     The Limited Partnership was the minority owner of Infinity Q. Infinity Q is currently being managed by a representative of the Limited Partnership.

22.     The Pricing Service is a service, offered by a financial services and data company, which markets itself as providing a comprehensive platform to structure and price derivatives, among other complex financial instruments.

23.     A multiple series Delaware statutory trust (the "Trust") is registered under the Investment Company Act as an open-end series management investment company. The Trust purports to be a cost-efficient platform for mutual fund advisers by providing a shared board,

insurance, and other economies of scale for mutual funds. The Mutual Fund is a series of the Trust.

24.     The Board of the Trust (the "Board") oversees the Mutual Fund.

25.     A global fund administrator (the "Administrator") serves as the Mutual Fund's administrator, fund accountant, and transfer agent. The Administrator also serves as the Mutual Fund's custodian and provides compliance services to the Infinity Q Funds.

26.     An audit, accounting, advisory, and consulting firm (the "Auditor") has served as the Mutual Fund's and the Private Fund's auditor since 2018.

**FACTS**

I.     **Background**

     **A.  Infinity Q and the Infinity Q Funds**

27.     In approximately 2014, Velissaris started Infinity Q, an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).

28.     Infinity Q has been registered as an investment adviser with the SEC since May 6, 2014.

29.     Lindell is also an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act. Lindell was an owner and officer of Infinity Q. Lindell also served as Infinity Q's CRO, where he was responsible for analyzing investment risk for the Mutual Fund's and Private Fund's portfolios. In the Infinity Q ADV Brochure, Lindell was further identified as an Infinity Q "portfolio manager" and "investment professional." Lindell also received compensation, through Infinity Q, in the form of advisory fees charged to the Mutual Fund and the Private Fund for providing investment advice concerning securities. As such, Lindell was in the business of providing investment advice concerning securities to Infinity Q.

30.     Lindell, as an investment adviser to the Infinity Q Funds, owed a fiduciary duty to the Infinity Q Funds.

31.     During the Relevant Period, Infinity Q offered two main products, which held the majority of the assets advised by Infinity Q: (a) the Mutual Fund (launched in 2014); and (b) the Private Fund (launched in 2017).

32.     Through its Mutual Fund, Infinity Q sought to attract retail investors. The Mutual Fund had thousands of investors, including at least one investor located in this District.

33.     Through its Private Fund, Infinity Q sought to attract institutional investors, which included public pension funds, university endowments, and charitable foundations, among others. The Private Fund had dozens of investors, including at least one investor located in this District.

34.     The Mutual Fund's and the Private Fund's portfolios consisted primarily of cash and a variety of equity and derivative positions, including swaps. The swaps held by the Infinity Q Funds were predominately variance swaps, the value of which was tied to measures of volatility.

35.     Velissaris operated as the CIO and head trader at Infinity Q.

36.     Velissaris was the sole decision-maker at Infinity Q for the valuation of the Mutual Fund's and the Private Fund's positions.

## II.     Velissaris's Mismarking Scheme

37.     During the Relevant Period, Velissaris manipulated the valuations of the Infinity Q Funds' positions in the Pricing Service by effectively setting the terms and editing computer code to produce valuations of positions at whatever level he desired.

38.     For certain over-the-counter ("OTC") derivative transactions, the Pricing Service did not initially have a standard model, and so Pricing Service engineers would sometimes, at a customer's request, derive a custom model to value those positions (a "Custom Model").

39.     Like regular models, Custom Models also allowed a user to enter terms of the swap transaction into fields in a user interface. For example, a Custom Model for a corridor variance swap provided entry fields for the position's strike price (a fixed price, determined at the transaction's inception), vega notional (the amount paid per 1 percentage point shift in variance), effective date (when variance begins accruing), termination date (when variance stops accruing), underlying reference asset (typically an index), corridor boundaries (the boundaries within which the reference asset must remain to accrue variance), and "scaling factor."

40.     The underlying valuation code for Custom Models was only viewable to a user by clicking on a small box on the user interface, which would then show the underlying code in a separate window on the user's screen.

41.     Velissaris had the ability to view the underlying valuation code for all Pricing Service models used by the Infinity Q Funds. Velissaris additionally had the ability to both view *and edit* the underlying valuation code in Custom Models that he selected for use by the Infinity Q Funds. The ability to edit the underlying valuation code was not available on the standard models available from the Pricing Service.

42.     To that end, the Pricing Service included a warning at the bottom of the underlying valuation code in the Custom Models, which stated that it was the customer's responsibility to ensure that the code being used matched the terms of the transaction. The warning stated: "(*** This [] script is used as an example for illustration purposes. Clients must

make sure that the input parameters entered into the script faithfully represent the term sheet that they would like to price. ***)."

43.    Velissaris saved the initial Custom Models provided by the Pricing Service and reused them to value new positions as they were added to the Infinity Q Funds' portfolios.

44.    Given the functionality of the Pricing Service, Velissaris had the ability to adjust inputs and terms entered into the user interface's fields on a transaction-by-transaction basis. Velissaris also had the ability to alter the underlying valuation code in the Custom Models in order to price positions at more desirable valuations.

45.    Velissaris's scheme to mismark and inflate the Infinity Q Funds' values included (a) making changes to the underlying valuation code; (b) entering or changing inputs into the Pricing Service models that did not match the terms sheets for the positions; (c) selecting improper valuation models for positions; and (d) cherry picking a desirable volatility surface for pricing.

46.    As a result of Velissaris's mismarking, Infinity Q received excessive performance and management fees to which it was not entitled.

47.    Through most of 2021, when his scheme began to unravel, Velissaris did not disclose to anyone at Infinity Q, the Board, the Administrator, the Auditor, or investors the extent to which he had the ability to, and did, manipulate the Pricing Service, including that he was editing the underlying valuation code, such that he could effectively determine valuations for positions himself.

### III.   Lindell's Misconduct

#### A.   Lindell's Role at Infinity Q

48.     Among other things, Lindell was "responsible for monitoring portfolio risk exposures, enhancing the firm's risk analytics, and ensuring compliance with regulatory guidelines," according to Infinity Q's marketing materials.

49.     In the Infinity Q ADV Brochure, Lindell was further identified as an Infinity Q "portfolio manager" and "investment professional."

50.     In addition, Lindell was also responsible for managing Infinity Q's day-to-day operations and, on occasion, communicating with investors and potential investors.

51.     Velissaris and Lindell were two of the three members of the Infinity Q Valuation Committee.

52.     The Infinity Q Valuation Committee was, according to the firm's compliance manual, responsible for "determining fair values and to ensure timely analysis and implementation of policies related to the pricing of individual securities or groups of securities that may be held by the [Infinity Q Funds]."

53.     There were no formal Valuation Committee meetings at Infinity Q after at least 2018.

54.     In practice, Lindell had no day-to-day involvement with Infinity Q's investment decision-making or the valuation of the Infinity Q Funds' positions.

55.     Prior to joining Infinity Q, Lindell's experience consisted of risk management and measurement for other registered investment advisers and working as an equities trader.

#### B.  Lindell Ignored Red Flags about Velissaris's Use of the Pricing Service

56.     Given Lindell's role as a member of Infinity Q's portfolio management team, as its CRO, head of operations, and CCO, and as a member of its Valuation Committee, Lindell

11

failed to exercise reasonable care and failed to undertake an appropriate investigation concerning multiple red flags that indicated Velissaris's marks of the Infinity Q Funds' positions were inappropriate.

57.     Lindell, along with Velissaris, was the primary contact for Infinity Q's swap counterparties in connection with margin requirements. In this role, Lindell became aware that certain of the Infinity Q Funds' counterparties were ascribing vastly different marks from Infinity Q to the same positions.

58.     In December 2019, Lindell himself compared (i) the end-of-day position values for the Mutual Fund and the Private Fund, as calculated by the counterparty, which were sourced from the counterparty's daily margin reports; with (ii) the marks generated by Velissaris for the Infinity Q Funds. Lindell emailed Velissaris that the marks sourced from the counterparty's margin reports "differ from [the Pricing Service] substantially. Please have a look." Because the counterparty valuations were often substantially lower than Infinity Q's, it meant that Infinity Q had to post additional collateral with the counterparty. Infinity Q typically then posted such collateral without seeking to show the counterparties why its valuations were more accurate. Beyond discussing with Velissaris and receiving assurances, Lindell took no further action in response to these red flags.

59.     Lindell also knew or should have known that certain positions that Infinity Q valued as having a positive value just days before their termination date ended up expiring worthless or at significantly lower values than the ones Velissaris generated through the Pricing Service.

60.     For example, in July 2020, Lindell wrote to Velissaris about the settlement of a certain correlation swap that expired on July 7, 2020. Lindell informed Velissaris that the

"settlement amount is [$]430k worse than yesterday's [Pricing Service valuation]." However, beyond discussing with Velissaris and receiving assurances, Lindell took no further action in response to these red flags.

61.     By mid-2020, Lindell was also made aware of allegations that certain positions held by the Mutual Fund were being reported in its SEC filings as having mathematically impossible values, among other reporting errors. Beyond discussing with Velissaris and receiving assurances, Lindell again took no further action in response to these red flags.

### C. Lindell Made Misrepresentations to Investors and Others about Velissaris's Use of the Pricing Service

62.     Lindell negligently misrepresented to investors, potential investors, representatives of the Board, and others that the Pricing Service was independent of Infinity Q when, in fact, Velissaris exercised control over the Pricing Service.

63.     For example, in April 2018 Lindell emailed representatives of the Board: "Infinity Q does not price any securities ourselves. Prices are either provided by [the Pricing Service] directly to [the Administrator] for non-vanilla OTC instruments or we forward [the Pricing Service's] values to [the Administrator] for positions not requiring [Pricing Service] valuation."

64.     Lindell also referred to the Pricing Service as "independent" in communications to investors and potential investors in the Infinity Q Funds during due diligence and other meetings.

65.     For example, in August 2019 Lindell informed an operational due diligence consultant, which was conducting due diligence on the Private Fund on behalf of a potential investor, that Infinity Q "sends [the Pricing Service] the details and [the Pricing Service] will model the securities independent of [Infinity Q]." The potential investor subsequently invested in the Private Fund.

66.     In fact, Velissaris exercised control over the Pricing Service, which rendered it not "independent" from Infinity Q.

67.     Since at least 2017, Lindell was at least aware that Velissaris himself uploaded the terms of Infinity Q Funds' positions to the Pricing Service, Velissaris could "override" prices generated by the Pricing Service, and Velissaris could make changes to inputs within the Pricing Service. Lindell was also aware that Velissaris had the ability to select among different volatility surfaces—one of a handful of inputs—when pricing positions, which Lindell understood could impact pricing. Thus, Lindell should have been aware that the Pricing Service was not providing truly "independent" third-party valuations of Infinity Q's OTC positions.

68.     Lindell failed to exercise reasonable care in obtaining and communicating accurate information about Infinity Q's use of the Pricing Service and failed to undertake an appropriate investigation before representing the Pricing Service's purported "independence." A reasonable person in Lindell's operational, investment risk, portfolio management, compliance, and Valuation Committee roles would not make such statements without undertaking some investigation or at least obtaining a basic understanding of how the Pricing Service worked and how Velissaris was using it, which Lindell did not do.

### D.  Lindell's Role in Velissaris's Obstruction of the Staff's Investigation

69.     At Velissaris's behest, Lindell helped Velissaris submit misleading documents to the SEC staff in response to the staff's initial inquiries in this matter.

70.     In May 2020, after receiving the staff's initial request that Infinity Q provide various investor materials (the "May 2020 Request"), Lindell was aware that the staff's investigation was focused on valuation issues at Infinity Q.

71.     The May 2020 Request called for "the original Documents" that were responsive to the requests. However, rather than provide the original materials that had been shared with

investors, Velissaris, in contemporaneous consultation with Lindell over a messaging platform, altered significant portions of Infinity Q's materials, in particular materials addressing Infinity Q's valuation policies and procedures and private placement memoranda that referenced Infinity Q's valuation policy, before directing Lindell to provide them to the SEC staff in response to the May 2020 Request.

72.     In June 2020, the SEC staff requested additional materials from Infinity Q, including documents concerning Infinity Q's Valuation Committee and all of that Committee's meeting minutes (the "June 2020 Request").

73.     Infinity Q's investor materials, which had been produced to SEC staff, represented that Infinity Q had a Valuation Committee, which met monthly or more often if needed. In fact, there were no formal Valuation Committee meetings, or, therefore, any purported minutes of those meetings.

74.     Accordingly, days before responding to the SEC staff, Velissaris fabricated notes purporting to be taken during or shortly after Valuation Committee meetings in 2019 and 2020. Lindell then submitted those fabricated notes to the staff in response to the June 2020 Request, even though he knew they were not contemporaneous notes.

**E.  Lindell's Misstatements on Infinity Q's Form ADV**

75.     On April 9, 2020, and again after an update on July 29, 2020, Lindell signed the Infinity Q Form ADV.

76.     The Forms ADV signed by Lindell contained a certification that stated: "I certify that the adviser's books and records will be preserved and available for inspection as required by law."[2]

77.     Lindell knew or at least recklessly disregarded when he signed the Infinity Q Form ADV on July 29, 2020, that this certification was false and misleading due to his submission of misleading and fabricated documents to the SEC staff in the weeks prior.

78.     Further, from 2018 through 2021, Infinity Q's Forms ADV, signed by Lindell, indicated that 100% of "the private fund's assets by value w[ere] valued by a person, such as an administrator, that is not your related person."

79.     Lindell knew or at least recklessly disregarded that at least some prices for positions held by the Private Fund that Velissaris deemed too complicated, complex, or expensive for the Pricing Service were valued outside of the Pricing Service by Velissaris himself and provided directly to the Administrator for valuation purposes. Thus, this representation was also false and misleading.

### F.  Lindell's Role in Misleading the Mutual Fund's Auditor

80.     In connection with the audit of the Mutual Fund for the fiscal year ending August 31, 2020, Lindell uploaded numerous OTC derivative term sheets or trade confirmations

---

[2]     The form ADV further provided the following warnings and certifications:

WARNING:  Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. ***

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct . . . .

requested by the Auditor, which were documents between Infinity Q and its counterparties that reflected the terms of the swap transactions.

81.     As part of the audit, the Auditor subsequently hired a specialist to perform a re-valuation analysis on certain derivative positions held by the Mutual Fund, including a certain corridor variance swap that Infinity Q valued at approximately $22 million.

82.     In September 2020, after being made aware of the particular corridor variance swap position selected for re-valuation analysis, Velissaris fraudulently altered the position's term sheet. Velissaris reduced the lower bound of that swap's corridor so that the re-valuation analysis would align with his valuation via the Pricing Service.

83.     Velissaris then instructed Lindell to upload the fraudulently altered term sheet to the Auditor's document portal; Velissaris did not tell Lindell what specifically he had done and instead explained that he had detected an error in the original term sheet, which required it be replaced.

84.     Accordingly, Lindell uploaded the replacement trade document to the Auditor's document portal without making any attempt to determine how it might have been that there was an error in the term sheet or how Velissaris had detected it, and Lindell did not alert the Auditor to the purported error.

85.     The Auditor and its valuation expert relied on the false information in the altered term sheet in determining that Infinity Q's valuation for the Mutual Fund was reasonable.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(2) and (3)

86.     The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 85.

87.     By engaging in the acts and conduct described in this Complaint, Defendant,

directly or indirectly, singly or in concert with others, in the offer or sale of securities and by use

of the means or instruments of transportation or communication in interstate commerce or by use

of the mails: (a) negligently obtained money or property by means of untrue statements of a

material fact or omissions of a material fact necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading; and/or (b) negligently

engaged in transactions, practices, or courses of business which operated or would operate as a

fraud or deceit upon purchasers of such securities..

88.     By reason of the foregoing, Defendant, directly or indirectly, singly or in concert,

has violated and, unless enjoined, will again violate, Securities Act Section 17(a) [15 U.S.C.

§ 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Rule 13b2-2

89.     The SEC realleges and incorporates by reference here the allegations in

paragraphs 1 through 85.

90.     By engaging in the acts and conduct described in this Complaint, Defendant,

directly or indirectly, singly or in concert, in connection with the purchase or sale of securities

and by the use of the means or instrumentalities of interstate commerce, or the mails, or the

facilities of a national securities exchange, knowingly or recklessly, being an officer or director

of an investment adviser to an  investment company registered under Section 8 of the Investment

Company Act of 1940 [15 U.S.C. 80a-8], (1) made or caused to be made a materially false or

misleading statement to an accountant in connection with, or omitted to state, or caused another

person to omit to state, any material fact necessary in order to make statements made, in light of

the circumstances under which such statements were made, not misleading to an accountant in

18

connection with: (a) any audit, review, or examination of the financial statements of the investment company required to be made pursuant to this subpart; or (b) the preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise; and (2) took actions to coerce, manipulate, mislead, or fraudulently influence any independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of that investment company that are required to be filed with the SEC, knowing or should have known that such action, if successful, could result in rendering the investment company's financial statements materially misleading.

91.     By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

### THIRD CLAIM FOR RELIEF
### Violations of Advisers Act Section 206(2)

92.     The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 85.

93.     At all relevant times, Lindell was an investment adviser under Advisers Act Section 202(a)(11) [15 U.S.C. § 80b-2(a)(11)]. Defendant Lindell owed the Infinity Q Funds a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair disclosure of all material facts, as well as a duty to act in the Funds' best interests.

94.     By engaging in the acts and conduct described in this Complaint, Defendant, directly or indirectly, singly or in concert with others, while acting as an investment adviser, by use of the mails or the means and instrumentalities of interstate commerce, has negligently engaged in transactions, practices, and courses of business which operated or would have operated as a fraud or deceit upon clients or prospective clients.

95.     By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Advisers Act Section 206(2) [15 U.S.C. § 80b-6(2)].

**FOURTH CLAIM FOR RELIEF**
**Violations of Advisers Act Section 206(4) and Rule 206(4)-8 Thereunder**

96.     The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 85.

97.     Each of the Infinity Q Funds was a pooled investment vehicle within the meaning of Rule 206(4)-8(b) of the Advisers Act [17 C.F.R. § 275.206(4)-8(b)]. Each of the Funds was engaged in, held itself out as being engaged primarily, and proposed to engage itself primarily in the business of investing, reinvesting, and/or trading in securities, and thus was an investment company as defined in Section 3(a) of the Investment Company Act of 1940 [15 U.S.C. § 80a-3(a)] or would have been an investment company under that provision but for the exclusion provided from that definition under either Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act of 1940 [15 U.S.C. § 80a-3(c)(1) & (7)].

98.     By engaging in the acts and conduct described in this Complaint, Defendant, directly or indirectly, singly or in concert with others, while acting as an investment adviser to a pooled investment vehicle, negligently (i) made an untrue statement of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; and/or (ii) engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative, with respect to an investor or prospective investor in the pooled investment vehicle.

99.     By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a) thereunder [17 C.F.R. § 275.206(4)-8(a)].

## FIFTH CLAIM FOR RELIEF
### Violations of Advisers Act Section 207

100.    The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 85.

101.    By engaging in the acts and conduct described in this Complaint, Defendant, directly or indirectly, singly or in concert with others, by use of the mails, and the means and instrumentalities of interstate commerce, willfully made untrue statements of material fact in, and omitted to state material facts required to be stated in, reports required to be filed with the SEC under Section 203 of the Advisers Act. A Form ADV is a registration application or report filed with the Commission pursuant to Section 203 of the Advisers Act.

102.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Advisers Act Section 207 [15 U.S.C. § 80b-7].

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Advisers Act Section 204(a) and Rule 204-2

103.    The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 85.

104.    By engaging in the acts and conduct described in this Complaint, Infinity Q directly or indirectly, while acting as an investment adviser, by use of the mails or the means and instrumentalities of interstate commerce, (i) failed to make and keep required books and records related to Infinity Q's advisory business; and (ii) failed to furnish to the SEC copies of books and

records that Infinity Q was required to make, keep, and provide to representatives of the SEC upon request.

105.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, aided and abetted Infinity Q's violations of Advisers Act Section 204(a) [15 U.S.C. § 80b-4(a)] and Rule 204-2 thereunder [17 C.F.R. § 275.204-2] by knowingly or recklessly providing substantial assistance to Infinity Q's violations pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)] and, unless enjoined, Defendant will again aid and abet violations of these provisions.

**SEVENTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Advisers Act Section 206(4) and Rule 206(4)-7**

106.    The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 85.

107.    By engaging in the acts and conduct described in this Complaint, Infinity Q, knowingly, recklessly, and/or negligently, provided investment advice to its clients without adopting and implementing written policies and procedures reasonably designed to prevent violation, by Infinity Q and Infinity Q's supervised persons, of the Advisers Act and the rules promulgated under the Advisers Act. Infinity Q thereby violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7].

108.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, aided and abetted Infinity Q's violations of Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7] by knowingly or recklessly providing substantial assistance to Infinity Q's violations pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)] and, unless enjoined, Defendant will again aid and abet violations of these provisions.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendant and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2], Sections 204(a), 206(2), 206(4), and 207 of the Advisers Act [15 U.S.C. §§ 80b-4(a), 80b-6(2), 80b-6(4), 80b-7], and Rules 204-2 and 206(4)-7 [17 C.F.R. §§ 275.204-2, 275.206(4)-7];

### II.

Ordering Defendant to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations;

### III.

Ordering Defendant to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)];

### IV.

Permanently prohibiting Lindell from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)] under Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)];

## V.

Granting any other and further relief that may be appropriate and necessary.

## JURY DEMAND

The SEC demands a trial by jury.

Dated: New York, New York
        September 30, 2022

Respectfully submitted,

_____
Andrew Dean
Preethi Krishnamurthy
Joshua Brodsky
David H. Tutor
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-0024 (Tutor)
Email: TutorD@sec.gov

Of Counsel
Osman Nawaz

24